# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

936

CAF 10-00834

PRESENT: SMITH, J.P., FAHEY, PERADOTTO, LINDLEY, AND SCONIERS, JJ.

IN THE MATTER OF BRIDGET Y., KELLY Y.,
COLLEEN Y., AND MICHAELA Y.
-------------------------------------------------
CHAUTAUQUA COUNTY DEPARTMENT OF SOCIAL SERVICES,      OPINION AND ORDER
PETITIONER-RESPONDENT;

KENNETH M.Y. AND RITA S., RESPONDENTS-APPELLANTS.
(APPEAL NO. 1.)

LAW OFFICE OF ROBERT D. ARENSTEIN, NEW YORK CITY (RICHARD T. SULLIVAN
OF COUNSEL), FOR RESPONDENTS-APPELLANTS.

JANE E. LOVE, MAYVILLE, FOR PETITIONER-RESPONDENT.

ANDREW T. RADACK, ATTORNEY FOR THE CHILDREN, SILVER CREEK, FOR KELLY
Y. AND COLLEEN Y.

MICHAEL J. SULLIVAN, ATTORNEY FOR THE CHILDREN, FREDONIA, FOR BRIDGET
Y. AND MICHAELA Y.

-----------------------------------------------------------------------------------

Appeal from an order of the Family Court, Chautauqua County
(Judith S. Claire, J.), entered March 5, 2010 in a proceeding pursuant
to Family Court Act article 10.  The order, among other things,
determined the subject children to be neglected.

It is hereby ORDERED that said appeal insofar as it concerns
Colleen Y. and Kelly Y. is dismissed and the order is affirmed without
costs.

Opinion by PERADOTTO, J.:  The primary issue raised in these
appeals is whether Family Court properly exercised temporary emergency
jurisdiction over the subject children pursuant to Domestic Relations
Law § 76-c (3).  Kenneth M.Y. and Rita S., the parents of the subject
children (hereafter, parents), are the respondents in appeal No. 1 and
two of the four respondents in appeal No. 2.  In appeal No. 1, the
parents appeal from an order of fact-finding and disposition
determining, following a fact-finding hearing, that their children are
neglected and placing the children in the custody of petitioner
Chautauqua County Department of Social Services (DSS), the petitioner
in appeal No. 1 and one of the four petitioners in appeal No. 2.  In
appeal No. 2, the parents appeal from a corrected order that, inter
alia, denied their motion to vacate the order of fact-finding and
disposition in appeal No. 1.  The parents contend in both appeals that
Family Court, Chautauqua County (hereafter, Family Court), lacked

subject matter jurisdiction because New Mexico is the home state of the children, the neglect took place in New Mexico, and the parents are neither domiciliaries of nor otherwise significantly connected to New York State. Under the unique circumstances of this case, we conclude that the court properly exercised temporary emergency jurisdiction pursuant to section 76-c (3) inasmuch as the children are in imminent risk of harm, and we therefore conclude that both orders should be affirmed.

## Factual Background and Procedural History

This matter involves multiple proceedings commenced in New York and New Mexico by various and overlapping parties, substantial motion practice, and numerous orders entered in New York and New Mexico. Although the appeals are limited to the neglect proceeding commenced by DSS in New York, an overview of the factual background and procedural history is necessary in order to assess the propriety of Family Court's assertion of temporary emergency jurisdiction pursuant to Domestic Relations Law § 76-c (3).

Respondent Kenneth M.Y. (hereafter, father), the biological father of the children, married respondent Rita S. (hereafter, stepmother), after the children's biological mother died in September 2001. The stepmother subsequently adopted the children. At some time between February 2007 and November 2007, the parents moved with the children from Pennsylvania to New Mexico.

On August 7, 2008, the parents were arrested and were each charged with seven counts of child abuse with respect to the children. The charges stemmed from allegations that the parents left Kelly and Colleen, then 15 years old, and Michaela, then 12 years old, unsupervised in a bug-infested trailer miles away from the family residence, with limited supplies and inadequate food for a period of six to eight weeks. It was further alleged that the parents, as a form of discipline, had confined each of the children to their bedrooms or to the garage for days, weeks, or months at a time. While confined to the garage, the children received only water, bread, peanut butter and a sleeping bag, and they were permitted to use the bathroom once or twice a day.

As a result of the criminal charges, a Magistrate Court in New Mexico ordered the parents to avoid all contact with the children. In light of the no-contact order, on August 11, 2008 the parents placed the children in the care of their "maternal step-aunt and uncle" (hereafter, aunt and uncle), Robin S. and Paul S., who are respondents in appeal No. 2. Robin S. signed a "safety contract" with the New Mexico Children, Youth and Families Department (CYFD), which states that the parents voluntarily placed the children in the care of the aunt and uncle and that the parents were "still legally responsible for the [children's] well-being." Robin S. agreed to prohibit any contact between the parents and the children and to advise the Dona Ana County District Attorney's Office in the event that the parents attempted to remove the children from her care or otherwise to contact the children in any way. Robin S. transported the children to her

home in Chautauqua County, New York.

By letter dated September 22, 2008, CYFD notified the parents that it had closed its file concerning the children. The letter further stated that

> "[t]he Department believes that the voluntary placement of the children with Robin S[.] was in the best interests of the children. However, [the parents] are free to make changes in that voluntary placement if they choose to as they remain the legal custodians of their children. The Department has no legal authority with respect to the children at this time. The safety contract between the Department and Robin S[.] was for placement purposes and does not prevent [the parents] from making changes to the children's placement."

According to the parents, they provided a copy of that letter to the aunt and uncle and notified them of their "intent to revoke the temporary placement of the minor children in their care and place the minor children with an appropriate guardian." The aunt and uncle refused to return the children, however, and instead filed a petition in Family Court seeking custody of the children.

On October 1, 2008, the parents were indicted in New Mexico on six counts each of felony abuse of a child in violation of New Mexico Statutes Annotated § 30-6-1 (D). Pursuant to the statute, "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished; or (3) exposed to the inclemency of the weather."

On November 5, 2008, the parents filed a "Petition to Determine Custody Pursuant to the [Uniform Child Custody Jurisdiction and Enforcement Act]" (hereafter, UCCJEA) in District Court in New Mexico (hereafter, New Mexico court) against the aunt and uncle. The petition alleged, inter alia, that the parents have resided in New Mexico since February 2007, that New Mexico is the home state of the children, and that the parents had placed the children with the aunt and uncle on a temporary basis "until a more suitable placement could be made or until [the parents'] conditions of release were modified or disposed of so that the children could be reunited with them." By their petition, the parents sought to place the children in the care and custody of a different temporary guardian. The parents thus sought an order confirming that they are the legal guardians of the children, and appointing a temporary guardian for the minor children until the criminal charges against them were resolved or their conditions of release were modified.

Two days later, Family Court issued a temporary order of custody asserting temporary emergency jurisdiction pursuant to Domestic

Relations Law § 76-c and granting temporary custody of the children to the aunt and uncle.  DSS thereafter commenced the instant neglect proceeding in Family Court by petition filed November 13, 2008, alleging that the parents had neglected each of the children.  At a Family Court appearance on November 24, 2008, an attorney for the parents appeared for the limited purpose of contesting jurisdiction, asserting that the parents are residents of New Mexico, that the alleged neglect took place in New Mexico, and that the children remain residents of New Mexico.  Family Court continued to assert temporary emergency jurisdiction over the matter.

On December 10, 2008, the New Mexico court issued an "Order Assuming Jurisdiction."  The New Mexico court determined that it had jurisdiction over the parties and the subject matter, i.e., the children, noting that the children had resided with the parents in New Mexico since February 2007 and expressly stating that New Mexico is the home state of the children.  With respect to the merits, the New Mexico court ruled that the parents "remain the sole legal custodians of the minor children, which includes the right to decide the temporary placement of the minor children with an appropriate guardian of their choosing."  According to the New Mexico court, the parents wished to nominate Jim L. and Angela L., residents of Ohio (hereafter, Ohio guardians), as temporary guardians of the children.  To that end, the New Mexico court ordered the parents to arrange for a home study of the Ohio guardians, and to pay for the cost of the home study.  Finally, the New Mexico court ruled that "[t]he issue of permanent custody is hereby reserved pending resolution of the criminal charges.  Following resolution of the criminal proceeding, the Court may appoint a guardian ad litem herein and may conduct in camera interviews of the minor children."  The parents sought to register the above New Mexico order in Family Court.  At a December 15, 2008 appearance, Family Court indicated that it had some concerns relative to relinquishing jurisdiction to the New Mexico court.  Specifically, the Family Court judge indicated that

> "[w]hat concerns me is, apparently, there is no neglect proceeding in the State of New Mexico.  There are criminal proceedings against these parents, but for whatever reason, there was no neglect proceeding . . . [W]ith criminal charges pending, and the children being the ones who would be put in the position of testifying, should there be a criminal trial, . . . the children are left with no legal remedies.  There hasn't even been a law guardian appointed . . . for these children in the State of New Mexico.  And the parents are given full authority to do whatever, and place these children wherever they so choose."

By order entered January 9, 2009, the New Mexico court approved the home study and ordered the immediate transfer of the children to the Ohio guardians.  The New Mexico court reiterated that the parents "are the sole legal guardians of the minor children and maintain their constitutional right to management and control of their minor

children," and approved "[t]he parents' selection of placement guardian for their minor children."  In light of that order, the parents requested that Family Court issue an order (1) registering and enforcing the New Mexico order assuming jurisdiction; (2) dismissing the New York custody proceeding; (3) dismissing the New York neglect proceeding; (4) vacating the temporary order of custody; and (5) enforcing the New Mexico transfer order.

DSS thereafter sought an award of temporary custody of the children.  In support thereof, DSS submitted an affidavit of a psychologist who had counseled each of the children.  The psychologist averred that the children "have related very credible stories of child abuse and neglect," and that the parents demonstrated a "disturbing pattern of isolating these children from each other, from children their age, and from their mother's relatives."  With respect to the proposed move to Ohio, the psychologist averred that

> "[a]ny change in placement for the [children] that is instigated by their father or adoptive mother carries the implicit message to these girls that they are still under the control of their father, and therefore still at risk for abuse and maltreatment . . . Removing them from an emotionally secure family environment, the friends they have recently established, and a school environment which has been affirming for them, must be considered a further emotional deprivation for these girls, and a demonstration to the girls that they remain at risk of capricious, abusive and insensitive treatment by their father. Accordingly, by generating a constant state of anxiety and uncertainty for them, such a move would result in a perpetuation of the emotional abuse and deprivation that these children suffered under the care of their father and adoptive mother."

Family Court granted temporary custody of the children to DSS, concluding that the basis for asserting emergency jurisdiction continued to exist.  Family Court explained that, "[w]hen there is a placement out of state in a situation where parents are facing criminal charges, and there is no underlying custody order, and no law guardian appointed for the children, . . . then the children are left without protection, plain and simple."

At the fact-finding hearing on the neglect petition, DSS introduced testimony from each of the children as well as from the maternal step-aunt, Robin S., and the children's psychologist, and Family Court received in evidence records from the New Mexico Police Department and financial records relative to the father.  Of note, the financial records reflect that the father, an orthopedic surgeon, had an annual income in excess of $280,000.  The parents failed to appear at the hearing and subsequently moved to dismiss the neglect proceeding for lack of personal and subject matter jurisdiction.

By the order in appeal No. 1, Family Court implicitly denied the parents' motion to dismiss the neglect proceeding by issuing an order of fact-finding and disposition, which determined that the parents neglected each of the four children, ordered that the children be placed in the custody of DSS, and adopted the permanency plan proposed by DSS.  By the corrected order in appeal No. 2, Family Court, inter alia, denied the parents' motion to vacate the order of fact-finding and disposition.

## Discussion

We note at the outset that the two older children have attained the age of 18 during the pendency of these appeals, and we therefore dismiss as moot the appeals insofar as they concern those two children (*see Matter of Anthony M.*, 56 AD3d 1124, *lv denied* 12 NY3d 702).

Initially, we agree with the parents that, absent the exercise of temporary emergency jurisdiction, Family Court would lack subject matter jurisdiction over the neglect proceeding.  Pursuant to New York's version of the UCCJEA (Domestic Relations Law art 5-A), Domestic Relations Law § 76 (1) "is the exclusive jurisdictional basis for making a child custody determination by a court of this state" (§ 76 [2]).  A "[c]hild custody determination" is defined as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child.  The term includes a permanent, temporary, initial, and modification order" (§ 75-a [3]).

Domestic Relations Law § 76 (1) provides in relevant part that,

> "[e]xcept as otherwise provided in section [76-c] of this title [pertaining to temporary emergency jurisdiction], a court of this state has jurisdiction to make an initial child custody determination only if:  (a) this state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state . . . ."

A child's "[h]ome state" is "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding" (§ 75-a [7]).  The UCCJEA broadly defines "[c]hild custody proceeding" as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue," including "a proceeding for divorce, separation, *neglect*, *abuse*, dependency, *guardianship*, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear" (§ 75-a [4] [emphasis added]).

Here, the neglect proceeding commenced by DSS falls within the

UCCJEA's expansive definition of a child custody proceeding (*see* Domestic Relations Law § 75-a [4]).  Further, there is no question that New Mexico, not New York, was the home state of the children at the time of commencement of the neglect proceeding.  When the neglect proceeding was commenced in November 2008, the children had been living in New York for only three months.  Prior to that time, the children lived with the parents in New Mexico for at least 10 consecutive months, i.e., from November 2007 until August 2008.  Thus, New Mexico remained the home state of the children when the neglect proceeding was commenced in New York, and Family Court lacked jurisdiction to make an initial child custody determination (*see* § 76 [1] [a], [2]; *see also Matter of Gharachorloo v Akhavan*, 67 AD3d 1013).

In addition, Domestic Relations Law § 76-e states that, "[e]xcept as otherwise provided in section [76-c] of this title[, i.e., temporary emergency jurisdiction], a court of this state may not exercise its jurisdiction under this title if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child[ren] has been commenced in a court of another state having jurisdiction substantially in conformity with this article . . . ." Here, at the time of commencement of the neglect proceeding in New York, the parents had already commenced a custody proceeding in New Mexico.  Thus, inasmuch as a custody proceeding was pending in the children's home state when the neglect petition was filed, New York was precluded from exercising jurisdiction except in an emergency (*see* § 76-e [1]; *see generally* Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 76-e).

We conclude, however, that Family Court properly exercised temporary emergency jurisdiction pursuant to Domestic Relations Law § 76-c.  In the absence of subject matter jurisdiction pursuant to section 76 (1), section 76-c provides that a New York court has "temporary emergency jurisdiction if the child[ren are] present in this state and the child[ren] ha[ve] been abandoned or it is necessary in an emergency to protect the child[ren], a sibling or parent of the child[ren]" (§ 76-c [1]; *see Matter of Hearne v Hearne*, 61 AD3d 758, 759).  There is no question that the children were present in New York at all relevant times in which Family Court exercised temporary emergency jurisdiction.  We are of course mindful that "the mere physical presence of the child[ren] in this [s]tate is not a sufficient basis per se for the exercise of jurisdiction . . . There must, in addition, be an emergency that is real and immediate, and of such a nature as to require [s]tate intervention to protect the child[ren] from imminent physical or emotional danger" (*Matter of Severio P. v Donald Y.*, 128 Misc 2d 539, 542; *see generally Matter of Vanessa E.*, 190 AD2d 134, 137; *Matter of Michael P. v Diana G.*, 156 AD2d 59, 66, *lv denied* 75 NY2d 1003; *De Passe v De Passe*, 70 AD2d 473, 474-475).

The duration of an order rendered pursuant to temporary emergency jurisdiction depends upon whether there is an enforceable child custody determination or a child custody proceeding pending in a court with jurisdiction (*see Matter of Callahan v Smith*, 23 AD3d 957, 958 n

2; *compare* Domestic Relations Law § 76-c [2], *with* [3]).  Here, a
child custody proceeding had been commenced in New Mexico when Family
Court first asserted temporary emergency jurisdiction.  Thus, Family
Court's exercise of temporary emergency jurisdiction is governed by
section 76-c (3), which provides that

>           "any order issued by a court of this state under
>           this section must specify in the order a period
>           that the court considers adequate to allow the
>           person seeking an order to obtain an order from
>           the state having jurisdiction under sections [76]
>           through [76-b] of this title.  The order issued in
>           this state remains in effect until an order is
>           obtained from the other state within the period
>           specified or the period expires, provided,
>           however, that where the child who is the subject
>           of a child custody determination under this
>           section is in imminent risk of harm, any order
>           issued under this section shall remain in effect
>           until a court of a state having jurisdiction under
>           sections [76] through [76-b] of this title has
>           taken steps to assure the protection of the
>           child."

     In this case, Family Court first exercised temporary emergency
jurisdiction on November 7, 2008, when it issued a temporary order of
custody in the proceeding commenced by the aunt and uncle.  In our
view, there is no question that an emergency existed at that point in
time.  On September 22, 2008, CYFD notified the parents' attorney that
it had closed its file concerning the children and that the parents,
as the "legal custodians of their children," were "free to make
changes in th[eir] voluntary placement."  Shortly thereafter, the
parents sent the stepmother's father, who lived with them, to New York
in an attempt to take the children to an undisclosed address in New
Mexico.  On November 5, 2008, the parents commenced a custody
proceeding in New Mexico seeking, inter alia, to place the children in
the care and custody of yet another temporary guardian.  According to
the aunt and uncle, the parents also made "a threat . . . immediately
before the [New Mexico] Grand Jury Proceedings where the children were
told that they would be taken to an unknown location."  The parents
initially sought to appoint the father's office manager as temporary
guardian for the children.  They then nominated the Ohio guardians,
allegedly "long time and close friends of the family," as the
temporary guardians of the children.  The children told their
attorneys and Family Court that they had never met the Ohio guardians.
We thus conclude that Family Court properly acted to protect the
children from imminent danger, i.e., the likelihood of returning the
children to the home at which the abuse and neglect occurred or to
another guardian under the control of the parents.  At that point in
time, no New Mexico court had issued an order protecting the children,
and CYFD – the New Mexico equivalent of DSS – had determined that it
had "no legal authority with respect to the children."

     The orders challenged on appeal, however, were issued after the

parents had obtained two orders in New Mexico:  (1) the December 10, 2008 order assuming jurisdiction, and (2) the January 9, 2009 order approving the home study and ordering the immediate transfer of the children.  The propriety of Family Court's orders thus depends upon whether this case falls within the narrow exception set forth in Domestic Relations Law § 76-c (3), which provides that, "where the child[ren] who [are] the subject of a child custody determination under this section [are] in imminent risk of harm, any order issued under this section shall remain in effect until a court [of the home state] has taken steps to assure the protection of the child[ren]." The Practice Commentaries caution that courts "should invoke the exception only rarely and in the most compelling circumstances" (Sobie, Practice Commentaries, § 76-c, at 517), and that "[t]he authority granted by the exception is best . . . reserved for the most egregious, unusual case" (*id*. at 519).  We conclude that this case falls within that category.

Here, the parents have each been indicted for six counts of felony child abuse in New Mexico as a result of their conduct in, inter alia, locking the children in a garage for days or weeks at a time and abandoning three of the four children in a trailer miles from the family residence for six to eight weeks in the summer of 2008. The police report filed in New Mexico states that the trailer was "not suitable for teenagers to be living in" and contained only a single chair and no beds.  The father locked the trailer door from the outside so that the children had to climb out of a window to exit the trailer.  When the police arrived at the scene, there was no food in the refrigerator or the pantry, and there was a single jar of peanut butter on the counter.

Confining the children to the trailer was the culmination of what appears to have been years of escalating abuse and neglect following the father's marriage to the stepmother in 2003.  Colleen testified at the fact-finding hearing that, before their mother's death, the children were enrolled in public school, regularly attended church, and engaged in activities such as sports, ballet and Girl Scouts. Upon the father's remarriage, the activities ceased and the children were enrolled in parochial schools.  After frequently changing schools for no reason apparent on the record before us, the children were removed from school and were home-schooled by the stepmother.  During their time in New Mexico, the children had no friends and did not participate in any sports or other extracurricular activities outside the home.

The children were routinely punished by being confined to their bedrooms and/or the garage.  The garage contained a table, a lamp, and a "bean bag" chair.  While so confined, the children were fed only water, peanut butter, and bread, and they were permitted to leave only once or twice a day when their father arrived to take them to the bathroom.  On one occasion, Michaela was confined to the garage for "about three months" because she failed to complete her home-school work assignment.  Michaela testified that, if she could not wait to use the bathroom, she used a "dog pen" on the side of the house. Kelly testified that her father left her in an unoccupied townhouse

for "a couple of weeks." The townhouse was unfurnished, and Kelly slept on the carpet. The father only allowed her to bring some clothes, peanut butter and bread, and a piece of cloth that she used as both a blanket and a towel. When the father brought Kelly back to the house, he placed her in the garage for another two weeks.

At some point, the parents informed Colleen, Kelly and Michaela that they were going back to school, but that they would have to wear "uniforms," i.e., "a pair of sweatpants and a T-shirt" in colors that their father had selected. The three girls then began taking money out of their stepmother's purse to purchase school clothes. When the parents discovered what the girls were doing, they called the police and the girls were arrested. About a week later, the father moved Colleen, Kelly and Michaela into the trailer in the middle of the night. The father brought peanut butter, bread, flour, and a bag of dried pinto beans as food for the children, and gave them a cellular telephone that was programmed to call only the parents. When the bread ran out, the children mixed flour and water to make "flat bread." The children testified that the trailer had broken windows and was infested with cockroaches, ants, beetles, and spiders, and that its only furnishings were one or two sleeping bags, two blankets, and a single chair. According to Family Court, photographs of the trailer depicted "a very bleak looking trailer, broken tiles, exposed nails, no furniture, and [a] mostly empty refrigerator, and totally empty freezer above, in sharp contrast to the house."

After the parents were arrested, CYFD completed an intake report concerning the children, which lists emotional and physical neglect, inadequate food, and close confinement. CYFD, however, apparently closed its file on the children without taking any further action after the aunt and uncle assumed physical custody of the children pursuant to the August 2008 "safety contract." Indeed, the aunt testified at the neglect hearing that she never heard from CYFD after the children moved to New York.

With respect to the first of the two New Mexico orders issued before the orders challenged on appeal, we note that, despite the criminal charges, the substantial evidence of abuse and neglect, and the no-contact order, the New Mexico court allowed the parents to select new guardians for the children and ruled that it would not address the issue of permanent custody until after the criminal charges had been resolved. The order provided that the New Mexico court "*may* appoint a guardian ad litem herein and *may* conduct in camera interviews of the minor children" following resolution of the criminal proceeding (emphasis added). The order further provided that the parents "shall not in any manner communicate with the minor children or cause any third party or their agent to communicate in any manner with the minor children *regarding this matter or the criminal matter*" (emphasis added). The New Mexico court thus left open the possibility of communication or contact between the parents and the children on other subjects. Although the New Mexico court ordered the parents to "continue to abide by the no[-]contact order or any further order" issued in the criminal proceeding, the court noted that "[t]here is no other order limiting [their] parental rights to the

minor children."  With respect to the second of the two New Mexico orders, the New Mexico court, after reviewing a home study arranged and paid for by the parents, reiterated that the parents "maintain their constitutional right to management and control of their minor children," approved the parents' "selection of placement guardian[s] for their minor children," and ordered the immediate transfer of the children to the Ohio guardians.  Thus, without any input from CYFD or any other agency charged with the protection of children, an attorney for the children, or the children themselves, the New Mexico court ordered that the children be transferred from family members to non-relatives who were strangers to them and who resided in a state with which they had no connection, all at the behest of the parents who had abused them.

We find it particularly troubling that CYFD failed to commence an abuse or neglect proceeding against the parents and that the New Mexico court failed to appoint an attorney for the children to advocate on their behalf pursuant to New Mexico law.  The Children's Code of the New Mexico statutes provides that its overriding purpose is to "provide for the care, protection and wholesome mental and physical development of children coming within [its] provisions," and specifies that "[a] child's health and safety shall be the paramount concern" (NM Stat Ann § 32A-1-3 [A]).  The Children's Code further articulates as one of its purposes "the cooperation and coordination of the civil and criminal systems for investigation, intervention, and disposition of cases, to minimize interagency conflicts and to enhance the coordinated response of all agencies *to achieve the best interests of a child victim*" (§ 32A-1-3 [F] [emphasis added]).  As relevant to this case, New Mexico Statutes Annotated § 32A-4-4 (A) provides that abuse and neglect complaints shall be referred to CYFD, which "shall conduct an investigation and determine the best interests of the child[ren] with regard to any action to be taken."  Upon completion of its investigation, CYFD is required either to "recommend or refuse to recommend the filing of [an abuse and/or neglect] petition" (§ 32A-4-4 [C]).  The Children's Code further provides that, "[a]t the inception of an abuse and neglect proceeding, the court *shall* appoint a guardian ad litem for a child under fourteen years of age.  If the child is fourteen years of age or older, the court shall appoint an attorney for the child" (§ 32A-4-10 [C] [emphasis added]).  The New Mexico Court of Appeals has stated that, "[a]s a general rule, the court, upon being apprised that a minor is unrepresented by counsel, has a duty to appoint a guardian ad litem *or* an attorney to protect the interests of such child" (*State of New Mexico ex rel. Children, Youth & Families Dept. v Lilli L.*, 121 NM 376, 378, 911 P2d 884, 886), and that "a failure to appoint either counsel *or* a guardian ad litem to protect the interests of a minor may constitute a denial of due process, thereby invalidating such proceedings" (121 NM at 379, 911 P2d at 887).

Here, as noted above, CYFD apparently failed to conduct the statutorily mandated investigation into the abuse and neglect allegations against the parents (*see* NM Stat Ann § 32A-4-4 [A]), and the agency also failed either to recommend or to refuse to recommend the filing of an abuse or neglect petition against them (*see* § 32A-4-4

[C]). Instead, CYFD simply transferred the children to New York and closed its file, leaving the children's fate to the wishes of their alleged abusers. In addition, upon asserting jurisdiction over the case, the New Mexico court failed to appoint a guardian ad litem or attorney for the children to "represent and protect the best interests of the child[ren] in [the] court proceeding" (§ 32A-1-4 [J]; *see* § 32A-4-10). The New Mexico court then proceeded to change the children's placement at the request of the parents without enabling the children to have a voice in the courtroom and without any consideration, let alone determination, of the children's best interests.

As previously noted herein, the children's psychologist averred in an affidavit presented to Family Court that the parents displayed a "disturbing pattern of isolating these children from each other, from children their age, and from their mother's relatives," and he opined that moving the children to Ohio at the behest of the parents "would result in a perpetuation of the emotional abuse and deprivation that the[] children suffered under the care of their father and adoptive mother".

Notably, the Ohio guardians were the parents' second choice, and thus both their first and second choices for guardians were non-relatives, the first being the father's office manager. As the Attorney for the Children argued in Family Court, the parents' actions in attempting to remove the children from their New York placement constituted "a continuing pattern of abuse to isolate [the children] from family members," and she and the psychologist similarly concluded that the parents' actions communicated to the children that they remain under the control of their abusers.

In light of the above-described circumstances, including the absence of a neglect proceeding in New Mexico and the refusal of the New Mexico court to act to protect the children pending the resolution of the criminal charges against the parents, we conclude that Family Court properly continued to exercise temporary emergency jurisdiction of the children after the issuance of the two New Mexico orders. In our view, the children remained "in imminent risk of harm," namely, emotional abuse inflicted by the parents, and it appears from the record before us that New Mexico has not acted to "assure the protection of the child[ren]" (Domestic Relations Law § 76-c [3]; *see generally Matter of Maureen S. v Margaret S.*, 184 AD2d 159, 165; *Matter of Janie C.*, 31 Misc 3d 1235[A], 2011 NY Slip Op 51007[U], *2-3; *Severio P.*, 128 Misc 2d at 545).

The parents further contend that, even if Family Court properly exercised temporary emergency jurisdiction in the neglect proceeding, such jurisdiction did not permit Family Court to enter an order of disposition. We reject that contention. Domestic Relations Law § 76-c (2), which applies when a child custody proceeding has not been commenced in the home state, expressly contemplates that an order entered pursuant to the exercise of temporary emergency jurisdiction may become a final child custody determination. Pursuant to section 76-c (2), "[i]f a child custody proceeding has not been or is not

commenced in a court of a state having jurisdiction under . . . this title, a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child."  Domestic Relations Law § 76-c (3), however, which is previously quoted herein and governs the instant case in light of the custody proceedings in New Mexico, contains no such provision.  Thus, orders issued pursuant to section 76-c (3) are required to expire at a date certain unless the "imminent risk of harm" exception applies, in which case the order applies "until [the home state] has taken steps to assure the protection of the child."

The parents contend that the absence of language pertaining to a final determination in Domestic Relations Law § 76-c (3) implies that a court exercising temporary emergency jurisdiction pursuant to that section is unable to issue final determinations.  Even assuming, arguendo, that the parents are correct, we conclude that Family Court is not thereby precluded from issuing the order of disposition in appeal No. 1.  Although an order of fact-finding and disposition is a final order for purposes of appellate review (*see Ocasio v Ocasio*, 49 AD2d 801; *see generally Matter of Gabriella UU.*, 83 AD3d 1306; *Matter of Mitchell WW.*, 74 AD3d 1409, 1411-1412), it is not a final or permanent "child *custody* determination" (§ 76-c [2], [3] [emphasis added]).  Rather, the order in appeal No. 1 here simply placed the children in the custody of DSS, scheduled a permanency hearing, and approved a proposed plan for the children.  Indeed, a placement with DSS is never intended to be a final or permanent custodial relationship.  In cases such as this in which a child is placed with DSS pursuant to Family Court Act § 1055, the court retains continuous jurisdiction over the case (*see* § 1088), and the child's placement is reviewed at permanency hearings conducted every six months (*see* § 1089 [a] [2], [3]).  Such jurisdiction continues until the child is "discharged from placement" (§ 1088), i.e., until permanency is achieved (*see* Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1086, at 193).  As the Practice Commentaries explain, Family Court "maintains complete continuing jurisdiction whenever a child has been placed outside his [or her] home.  Accordingly, the case remains on the Court's calendar — *there is no final disposition until permanency has been ordered* — and the Court may hear the matter upon motion at any time.  There is no need or requirement to wait until the next scheduled hearing date" (Sobie, Practice Commentaries, Family Ct Act § 1088, at 199-200 [emphasis added]).  The parents therefore may at any time petition for the return of their children and/or move to vacate or terminate the children's placement with DSS (*see* Sobie, Practice Commentaries, Family Ct Act § 1086; *see generally* § 1088).

Thus, the order of fact-finding and disposition in appeal No. 1, which concerns placement rather than custody of the children, does not conflict with New Mexico's order, which provides that the "issue of permanent custody is hereby reserved pending resolution of the criminal charges" against the parents.  Upon resolution of the criminal charges or when the emergency abates, i.e., when the New Mexico court ensures that the children are not "in imminent risk of harm" (Domestic Relations Law § 76-c [3]), the children's placement

with DSS may be revisited and the issue of permanent custody addressed.  Until then, the order of fact-finding and disposition simply maintains the status quo – placement in the custody of DSS – with periodic judicial review to assess any changed circumstances. Inasmuch as the order of fact-finding and disposition does not constitute a final custody determination, it cannot be said that Family Court exceeded the scope of its temporary emergency jurisdiction in issuing the order in appeal No. 1.

## Conclusion

We have reviewed the parents' remaining contentions and conclude that they are without merit.  Accordingly, we conclude that both orders should be affirmed.

FAHEY and SCONIERS, JJ., concur with PERADOTTO, J.; SMITH, J.P., dissents in part and votes to reverse in accordance with the following Opinion, in which LINDLEY, J., concurs:  We respectfully dissent in part because we cannot agree with the majority that Family Court properly exercised temporary emergency jurisdiction over the subject children.  Initially, we agree with the majority that the appeal must be dismissed with respect to the two older children because they are no longer under the age of 18, and thus that is the basis for our dissenting only in part.  We also agree with the majority that this proceeding falls within the expansive definition of a child custody proceeding set forth in the Uniform Child Custody Jurisdiction and Enforcement Act ([UCCJEA]; *see* Domestic Relations Law § 75-a [4]), and that there is no question that New Mexico, not New York, was the home state of the children at the time of commencement of the neglect proceeding at issue in this appeal.  In addition, we agree with the majority's further conclusion that, "inasmuch as a custody proceeding was pending in the children's home state when the neglect petition was filed, New York was precluded from exercising jurisdiction except in an emergency," as defined in section 76-c.  We cannot agree, however, that such an emergency existed here.

We begin with the proposition that "section 76 of the Domestic Relations Law forms the foundation of the UCCJEA and governs virtually every custody proceeding.  It is designed to eliminate jurisdictional competition between courts in matters of child custody" (*Matter of Michael McC. v Manuela A.*, 48 AD3d 91, 95, *lv dismissed* 10 NY3d 836; *see Matter of Felty v Felty*, 66 AD3d 64, 69-70).  Even under the UCCJEA's predecessor statute, jurisdiction could be established by demonstrating that the state at issue was the children's home state, but the "UCCJEA elevates the 'home state' to paramount importance in both initial custody determinations and modifications of custody orders" (*Michael McC.*, 48 AD3d at 95).  Under the pertinent section of the UCCJEA, a New York court "has temporary emergency jurisdiction if the child is present in this state and . . . it is necessary in an emergency to protect the child, a sibling or parent of the child" (§ 76-c [1]; *see Matter of Santiago v Riley*, 79 AD3d 1045).  Thus, we may uphold the orders on appeal only if the children require protection as the result of a qualifying emergency.

Although there is scant case law under the UCCJEA, the case law with respect to the predecessor statute to the UCCJEA provides that "New York can exercise jurisdiction [only] in an emergency situation 'vitally and directly' affecting the health, welfare, and safety of the subject child" (*Matter of D'Addio v Marx*, 288 AD2d 218, 219, quoting *Martin v Martin*, 45 NY2d 739, 742, *rearg denied* 45 NY2d 839). New York enacted the UCCJEA, revising the preexisting statute, to promote uniformity concerning child custody disputes regarding children who move from one state to another (*see Felty*, 66 AD3d at 69-70; *Stocker v Sheehan*, 13 AD3d 1, 4), and thus a finding of emergency jurisdiction under the UCCJEA requires a similar showing as that required under the predecessor statute. Indeed, the majority also relies upon cases decided under the predecessor statute, and it therefore appears that we are in agreement with the majority that those cases are still controlling with respect to the definition of an emergency for jurisdictional purposes.

Pursuant to that case law, it is settled that, although "the word 'emergency' may, arguably, be construed in a flexible manner so as to furnish a predicate for jurisdiction, in practice an emergency situation is extremely difficult to demonstrate. Thus, in order to establish an emergency, there must, in effect, be evidence of imminent and substantial danger to the child[ren] in question" (*Matter of Michael P. v Diana G.*, 156 AD2d 59, 66, *lv denied* 75 NY2d 1003; *see Matter of Hernandez v Collura*, 113 AD2d 750, 752). Therefore, New York courts may assert temporary emergency jurisdiction only "if the immediate physical and mental welfare of children require[s], vitally and directly," that they do so (*Martin*, 45 NY2d at 742; *see Matter of Vanessa E.*, 190 AD2d 134, 137). Furthermore, the UCCJEA Practice Commentaries continue to caution that courts "should invoke the exception only rarely and in the most compelling circumstances" (Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 76-c, at 517). "The authority granted by the exception is best left unused, or at least reserved for the most egregious, unusual case" (*id*. at 519).

In general, a risk of imminent harm arises when the children are to be returned to the custody of a person who abused them, raising a strong possibility that the abuse would recur (*see e.g. Matter of Woods v Woods*, 56 AD3d 789; *Matter of Callahan v Smith*, 23 AD3d 957; *Vanessa E.*, 190 AD2d at 137-138). If this were such a case, then the majority's decision would be proper. As the majority points out, the children's parents are charged with bizarre and dangerous acts of abuse, and any action that would require that the children be returned to them would place the children in imminent risk of harm. The reality of this situation, however, is that there is no imminent danger that the children will be returned to the parents or placed under their control.

As the majority correctly notes, prior to the issuance of the orders on appeal by the New York Family Court, the New Mexico court issued several orders, including one that assumed jurisdiction over custody of the children and another that transferred custody of them to a family in Ohio. The majority fails to note, however, that the

latter order contained an order of protection prohibiting the parents from communicating with the children in any manner, including through third parties, regarding the custody case or the criminal proceedings. The New Mexico court also ordered the parents to attend a court-approved Parent Education Workshop, approved a home study of the Ohio family by a licensed social worker and, most importantly, ordered that the children shall not be removed from the care of that family, or from a 100-mile radius of the Ohio family's residence without the prior approval of the New Mexico court. Consequently, there is no imminent risk that the parents will continue their alleged abuse of the children, and the majority's conclusion that the New Mexico court acted "without any consideration, let alone determination, of the children's best interests" is simply incorrect.

Similarly, the other risk upon which the majority relies in determining that Family Court properly exercised emergency jurisdiction, i.e., its conclusion that there is an imminent risk that the children will suffer further emotional abuse inflicted by the parents, does not "vitally and directly" impact the immediate physical or mental welfare of the children (*Martin*, 45 NY2d at 742). That conclusion is based upon the testimony of psychological experts that the children will suffer stress from having to move to a state with which they are not familiar and from living with people that they do not know, thus causing them to feel that they are under the control of their abusive parents. Although the move to Ohio may be stressful for the children, permitting Family Court to exercise temporary emergency jurisdiction under these circumstances would eviscerate the statute because any interstate jurisdiction question necessarily involves the likelihood of an interstate relocation. Inasmuch as there is no imminent danger that the children will be under the control of their parents, and in view of the fact that the New Mexico court retains control over any possible future contact that the parents will have with the children, we conclude that there is no imminent danger of abuse within the meaning of the statute.

Finally, we conclude that Family Court has issued an order that is in conflict with an order of the children's home state, and which has no provision for the eventual transfer of jurisdiction to the home state. Family Court has thereby created a jurisdictional competition rather than eliminating such a competition, the latter of which is required by the UCCJEA. "The best interest[s] of the children is, of course, the prime concern . . . That the children's best interest[s] must come first, however, does not mean that the courts of this State should disregard the prior [New Mexico order] and determine, as if writing on a clean slate, who would make a better [custodian] . . . If their [parents are] unfit parent[s], that is a matter for the [New Mexico] courts to decide . . . A different case would be presented if the immediate physical and mental welfare of [the] children required, vitally and directly, that the children be retained in this jurisdiction and that the courts in this State determine who shall have custody of them. Factors raising those difficult issues are not present in this case. It is the courts of [New Mexico] that should adjudicate the ultimate custody dispute if 'priority . . . be accorded to the judgment of the court of greatest concern with the welfare of

the children' . . . There is nothing presented in this case which suggests that the courts of the sister State are not competent or ready to do justice between the parties and for the children" (*Martin*, 45 NY2d at 741-742).  Accordingly, we would reverse the orders on appeal insofar as they apply to the children under the age of 18 and grant the parents' motion to dismiss the proceeding with respect to them for lack of jurisdiction.

Entered:  December 30, 2011                    Frances E. Cafarell
                                                Clerk of the Court